Filed 8/18/25  P. v. Valenzuela CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B337893 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA130283) |
| v. | |
| SYMON VALENZUELA, | |
| Defendant and Appellant. | |

APPEAL from judgment of the Superior Court of the County of Los Angeles, Victor D. Martinez, Judge.  Affirmed.

Judith Kahn, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, Daniel C. Chang, Deputy Attorney General, for Plaintiff and Respondent.

Defendant and appellant Symon Valenzuela and Leslie Serrano (Serrano) formed a plan to steal cars. Serrano would use an online dating platform to attract victims, and Valenzuela would take the victims' cars at gunpoint. The plan resulted in the death of one victim and the kidnapping and robbery of another. A jury convicted defendant of first degree murder (Pen. Code, § 187, subd. (a)),[1] two counts of carjacking (§ 215, subd. (a)), kidnapping for the purpose of robbery (§ 209, subd. (b)(1)), and second degree robbery (§ 211). In this direct appeal, he argues: (1) the prosecutor engaged in misconduct by misstating the law during closing argument; (2) multiple sentences were improper under section 654; and (3) the kidnapping for robbery sentence was not permitted by statute. We affirm.

## FACTUAL BACKGROUND

We limit our factual background to facts relevant to defendant's contentions and to provide necessary context.

### A. The Carjacking and Murder of Javier Rodriguez

Serrano testified that in June 2020 defendant and she formed a plan: she would set up a profile on Chispa, an online dating platform, meet up with men who responded, and defendant would steal the men's cars. On the morning of June 27, 2020, defendant showed her a revolver he was carrying in his waistband.

Serrano testified that Javier Rodriguez (Rodriguez) responded to her Chispa profile. They agreed to meet on June 27, 2020, and inhale nitrous oxide together. Serrano notified

---

[1] All statutory references in this opinion are to the Penal Code.

2

defendant by text message that Rodriguez would be picking her up, and she confirmed the plan to "kick him off the mountain and take off with his car." "Mountain" referred to Turnbull Canyon, an area between Hacienda Heights and Whittier they knew to be dark and remote. Defendant wrote, "We are gonna rob that n[-----] for his car . . . ."

Serrano testified that Rodriguez arrived in a black Nissan. She falsely told Rodriguez that defendant was her cousin and the owner of the nitrous oxide tank, and based on this representation, Rodriguez permitted both of them to enter his car. During the drive, defendant sent texts to Serrano and a friend, Javier Diaz, indicating that he was going to "pop" or "smoke" the driver and take his keys.

Serrano described the events that followed. Rodriguez drove to Turnbull Canyon and parked, and the group smoked marijuana outside the car. As she reached into the car to retrieve her backpack, she heard two "pops." Rodriguez reentered the car and drove away. Serrano and defendant found the car a short distance away, crashed into the mountainside. After pulling Rodriguez from the car, defendant drove the car with Serrano to Diaz's home. On the morning of June 28, 2020, Serrano posted a video on Instagram showing defendant driving the car.

Motorists who had been driving in Turnbull Canyon around 12:30 a.m. on June 28, 2020 testified that they encountered a black Nissan Altima that had crashed into the hillside. They saw a Hispanic male with a tattoo on the right side of his face[2] and a

---

[2] Photographs of defendant showed he had a tattoo of a cross on his cheek near his right eye.

Hispanic female in the car. The car sped away, and they found Rodriguez's body lying face down in dirt.

An autopsy showed Rodriguez died from two gunshot wounds to his back. Law enforcement found DNA likely belonging to defendant in the Nissan's interior, including on the steering wheel. Photos of the car were found on defendant's phone, and a photo of the car bearing a caption indicating it was for sale appeared on his Instagram account.

## B. The Kidnapping, Robbery, and Carjacking of Angel Salinas

Messages retrieved from Serrano's Instagram account showed that she arranged to meet Angel Salinas[3] (Salinas) on June 28, 2020. At trial, Serrano testified she did not recall meeting Salinas or the events that followed, attributing her lack of memory to ingesting alcohol and what she thought was Xanax earlier that day. She testified that she was later admitted to a psychiatric hospital and released on July 6, 2020.

A security camera at the Budget Inn Motel in El Monte captured the arrival of Salinas, driving a red Honda Accord, shortly before 10:00 p.m. on June 28, 2020. The motel's records indicated that he checked into room 210, where he was joined by Serrano. Serrano identified herself in a video taken by the security camera.

Serrano texted the room number to defendant. Security video showed defendant and an associate, Rudolfo Lujan, walking toward the room. In a text to Serrano, defendant stated, "We

---

[3]     Salinas did not testify at trial.

4

taking his car," confirmed he was outside the door, and directed her to open it.

Video from a security camera at a Wells Fargo branch in Rosemead, about four miles from the motel, showed Salinas's car arriving. Images from the ATM's camera showed Salinas with defendant standing close behind him. Around the same time, Wells Fargo sent an email to Salinas alerting him to unusual account activity.

A bystander who was near the ATM around 11:30 p.m. testified to his encounter with Salinas. He described Salinas as "frantic" and said Salinas asked to use his phone. Salinas told him that his car and phone had been stolen and that he wanted to leave the area, fearing the thieves would return. Salinas's call to the 911 operator was played for the jury. He reported that two Hispanic men in their early 20s armed with guns forced him to drive his car from the Budget Inn to the ATM. One of them, he said, had a cross tattoo below his right eye. Salinas also reported that he was unable to withdraw funds, the men threatened to kill him if he called the police, and they took his car and cell phone.

## C.     Investigation and Defendant's Arrest

On July 2, 2020, defendant was arrested during a traffic stop of Salinas's car. In the car, law enforcement found documents bearing defendant's name, including a diploma, a DMV vehicle transfer and reassignment form, and a certificate of title. They also recovered a red fanny pack that, according to Rodriguez's mother, belonged to her son.

**D.    Interview of Serrano**

On July 6, 2020, Serrano was interviewed by a police detective who was investigating the Salinas robbery.  The detective was then unaware of her involvement in a homicide.  Serrano told him she had witnessed a shooting at Turnbull Canyon.  The same day, she was interviewed by homicide detectives without a promise of immunity or leniency.  A recording of the interview was played for the jury.  Serrano provided her phone and passcode to the detectives and described substantially the same events that she testified to at trial.  She also shared an Instagram video that she shot after the shooting, which showed defendant driving Rodriguez's car.

Serrano, then a minor, was charged with murder and robbery in the juvenile court.  In December 2022, she entered into an agreement with the district attorney.  She agreed to plead guilty to murder and robbery and testify truthfully in court, and upon fulfillment of the agreement's conditions, would be sentenced to "home on probation."

## PROCEDURAL BACKGROUND

By a second amended information, defendant was charged with the murder of Rodriguez (§ 187, subd. (a), count 1); kidnapping Salinas to commit robbery (§ 209, subd. (b)(1), count 3); first degree residential robbery of Salinas (§ 211, count 4); and carjacking of Rodriguez and Salinas (§ 215, subd. (a), counts 2 and 5).

The case was tried in January 2023.  The defense did not present evidence at trial.  The jury convicted defendant as charged and found the murder of Rodriguez to be of the first

6

degree.  As to all counts, the jury found that defendant personally used a handgun.

Defendant was sentenced as follows: on count 1, life imprisonment with a minimum term of 25 years, plus 10 years for the firearm enhancement; on count 2, nine years plus 10 years for the firearm enhancement, stayed pursuant to section 654; on count 3, a consecutive life term with a seven-year minimum parole eligibility, plus 10 years for the firearm enhancement; on count 4, one year plus three years and four months for the firearm enhancement; and on count 5, five years plus 10 years for the firearm enhancement.

## DISCUSSION

### A.    Prosecutorial Misconduct – Counts One and Two

Defendant argues that the murder and related carjacking convictions should be reversed because the prosecutor misstated the law during closing argument.  First, he argues the prosecutor misled jurors by "telling them they 'must' accept 'reasonable' interpretations of circumstantial evidence."  Second, he argues that the convictions "rested on Serrano's questionable testimony and the prosecutor told jurors that, under CALCRIM 224, they *must* accept her testimony as true, although she was deceptive and an accomplice, because there was a reasonable explanation for her mendacity."

### 1.    *Additional Background*

The jury was instructed on the definitions of "circumstantial" and "direct" evidence and was told that both could prove or disprove the elements of an offense.  Relevant to this appeal, the trial court gave CALCRIM No. 224 as follows:

7

"Before you may rely on circumstantial evidence to conclude a fact necessary to find the defendant guilty has been proved, you must be convinced the People have proved each fact essential to that conclusion beyond a reasonable doubt.

"Also, before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty.  If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence.  *However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable.*"  (Italics added.)

In his closing argument, defense counsel argued that Serrano lied to investigators and the men she met online. Counsel also argued that Serrano faced serious criminal charges but received immunity or leniency in exchange for her testimony and that her lack of recollection concerning events at the motel was not believable.

In rebuttal, the prosecutor argued:  "[T]he defense wants you to believe that [Serrano was] not being honest because she says she didn't remember anything about the Budget Inn incident, but think about it in the logical way, common sense, that's what we want you to use, common sense.  Does it make sense that she would be brought in [for an interview] about only a

kidnapping and robbery and say I don't remember anything about it even though it's on video?  She identifies herself in that video.  Says that's definitely me, definitely me, but let me tell you about another incident that's way more serious than this I had complete full involvement in.  Does that make sense that she would do that just to protect herself on the less serious incident?  Doesn't make sense.  [¶]  Now, there's an instruction that's pretty important here.  *Duty to be reasonable.  It says 'you must accept the reasonable and reject the unreasonable.'*  So when you're thinking about all of this evidence, ask yourself is it reasonable or is it unreasonable."  (Italics added.)

Defense counsel objected that the prosecutor misstated the law.  The objection was overruled.  After arguments concluded, the defense moved for a mistrial.  Defense counsel argued that the prosecutor displayed a writing using a projector titled "'duty to be reasonable,'" which cited CALCRIM No. 224 and stated "'if one interpretation of the evidence appears to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable and reject the unreasonable.'"  Counsel argued that this instruction applied to circumstantial evidence, and it was a misstatement of law to display it while discussing Serrano's testimony and direct evidence.  The trial court denied the motion.

### 2. *Governing Law*

Claims of prosecutorial misconduct implicate different standards under federal and state law.  (*People v. Wallace* (2008) 44 Cal.4th 1032, 1070.)  Under the federal Constitution, a prosecutor commits reversible misconduct only if the conduct infects the trial with such unfairness as to make the resulting conviction a denial of due process.  (*People v. Davis* (2009)

9

46 Cal.4th 539, 612.) Under state law, reversal is required when a prosecutor uses deceptive or reprehensible methods to persuade the jury, and it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct. (*Ibid.*)

"Advocates are given significant leeway in discussing the legal and factual merits of a case during argument." (*People v. Centeno* (2014) 60 Cal.4th 659, 666 (*Centeno*).) Where, as here, the prosecutor is alleged to have misstated the law to the jury, this constitutes error only if (1) the prosecutor misstated the law, and (2) there is a reasonable likelihood the jury understood or applied the prosecutor's remarks in an improper or erroneous manner. (*People v. Collins* (2021) 65 Cal.App.5th 333, 340 (*Collins*).) The challenged remarks must be considered in the context of the whole argument and the instructions. (*Centeno, supra,* 60 Cal.4th at p. 667.) We shall not "'lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.'" (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1225, fn. 21.)

While claims of misconduct are reviewed for abuse of discretion, we independently examine the law and objectively examine how a reasonable juror would interpret the prosecutor's remarks. (*Collins, supra,* 65 Cal.App.5th at p. 340.) The denial of a motion for a mistrial based on prosecutorial misconduct is reviewed for an abuse of discretion. (See *People v. Williams* (1997) 16 Cal.4th 153, 210.)

3. *Analysis*

Defendant first argues that the prosecutor misstated the law by telling the jury that it "'must'" accept "'reasonable'" interpretations of circumstantial evidence. We disagree. The prosecutor's paraphrasing was based upon the language of CALCRIM No. 224, which instructed the jury that it must accept only reasonable conclusions drawn from circumstantial evidence. The court provided the jury with CALCRIM No. 224, making it aware of the instruction's precise requirements. Further, the court provided the jury with CALCRIM No. 200, which instructed it to follow the law as the court explained it, and if it believed an attorney's comments on the law conflicted with the court's instructions, it must follow the court's instructions. We presume that the jury understood and followed this instruction, and that it treated the paraphrasing as words spoken by an advocate. (*People v. Cortes* (2022) 75 Cal.App.5th 198, 205 (*Cortes*).)

Defendant's second argument is that the prosecutor committed misconduct when "she misused [CALCRIM No. 224] to tell jurors to do the opposite of what the law requires: *not* give accomplice testimony the benefit of the doubt . . . ." We disagree.

When argument is made in rebuttal to defense counsel's arguments, "'the prosecutor "cannot be charged with misconduct if [her] comments only spill over somewhat into a forbidden area; the departure from propriety must be a substantial one." [Citation.]'" (*People v. Thomas* (2021) 64 Cal.App.5th 924, 954.) While misstating the law is improper, the prosecutor is "'justified in making comments in rebuttal, perhaps otherwise improper, which are fairly responsive to argument of defense counsel and are based on the record.' [Citation.]" (*Ibid.*)

11

Defense counsel attacked Serrano's credibility in his closing argument. A rebuttal argument urging the jury to accept reasonable interpretations of the testimony and reject unreasonable ones did not misstate the law. It was consistent with the court's instructions that jurors use "common sense" to decide whether testimony is true and accurate (CALCRIM No. 226), that they may consider "anything that reasonably tends to prove or disprove" the truth and accuracy of testimony (*ibid.*), and that they were free to disregard any part of nonexpert opinion testimony that they found "unreasonable" (CALCRIM No. 333).

The trial court, moreover, gave instructions that specifically addressed accomplice testimony. The jury was instructed with CALCRIM No. 335, which forbade it from convicting defendant "based on the statement or testimony of an accomplice alone" and stated that accomplice testimony or statements that incriminated defendant could be used only if supported by independent evidence that tended to connect defendant to the commission of the crimes. We presume the jury understood and followed this instruction. (*Cortes, supra,* 75 Cal.App.5th at p. 205.)

After the challenged remarks, the prosecutor reminded the jury of other evidence of defendant's guilt, such as his incriminating texts, the video showing defendant driving Rodriguez's car, and his listing the car for sale. Serrano's testimony, the prosecutor argued, was "supported by other physical evidence. That is how you determine her credibility. We're not just asking you to take her story and believe it. We're asking you to take her story and believe it because all of this evidence tells you that what she told us was true and that's it."

12

Along with the instructions given, this argument rendered it unlikely that the jury applied an incorrect standard to accomplice testimony or understood that it was required to believe Serrano's testimony.

Thus, defendant has demonstrated neither prosecutorial misconduct, nor that the trial court abused its discretion in denying his motion for a mistrial.

## B.      Multiple Punishment Under Section 654

The trial court imposed separate sentences for counts 3 through 5 for the kidnapping, robbery, and carjacking of Salinas.  Defendant did not argue below that section 654 precluded multiple punishments.[4]  On appeal, he contends we must stay the sentences imposed on two counts pursuant to section 654 because all three crimes were undertaken with a single objective, namely "stealing items of value from Salinas."

### 1.     *Additional Background*

Before instructing the jury, the trial court asked the prosecutor about the robbery theory the People intended to pursue, given that count 4 of the operative information alleged a charge for first degree residential robbery.  The court observed that Salinas's phone was taken from him before he arrived at the ATM, returned to him at the ATM, and then was taken back, suggesting a "completed robbery of the cell phone" and a "potential separate robbery" of money.  After some discussion, the prosecutor proposed, and defense counsel agreed, to amend count

---

[4]      Errors in the application of section 654 may be corrected on appeal even in the absence of an objection to the trial court.  (*People v. Perez* (1979) 23 Cal.3d 545, 549, fn. 3 (*Perez*).)

4 to a charge of "second degree robbery for the phone," and "the attempted robbery at the ATM [would be treated as] the intent for the kidnap for robbery" (count 3), and on count 4, the jury would be instructed on second degree robbery.

During closing arguments, the prosecutor told the jury that count 4 was for robbery of the phone. She also argued that defendant's intent to commit a robbery during the kidnapping was established by his luring Salinas to the motel with the purpose of taking his car to "go to an ATM to rob him of all his money." With respect to carjacking, the prosecutor argued that defendant took Salinas's car while using a gun and threatening to kill him. The jury returned convictions and found he used a handgun for each crime.

2. *Governing Law*

Section 654, subdivision (a) provides: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." The starting point of a section 654 analysis is to determine whether the different crimes were completed by a single physical act. (*People v. Washington* (2021) 61 Cal.App.5th 776, 795 (*Washington*).) If so, the defendant may not be punished more than once for that act, regardless of his intent and objective. (*Ibid.*) If not, we consider whether a course of conduct reflected a single intent and objective or multiple intents and objectives. (*Ibid.*) Defendant does not contend that a single physical act completed the three offenses, so we turn to whether he had multiple intents and objectives.

14

"'The proscription against double punishment in section 654 is applicable where there is a course of conduct which . . . comprises an indivisible transaction punishable under more than one statute. . . .' [Citation.]" (*People v. Coleman* (1989) 48 Cal.3d 112, 162.)  "The divisibility of a course of conduct depends upon the intent and objective of the actor, and if all the offenses are incident to one objective, the defendant may be punished for any one of them but not for more than one." (*Ibid*.)  If the defendant had multiple or simultaneous objectives, independent of and not just incidental to each other, then he may be punished for each crime committed in pursuit of each objective.  This is so even if the crimes shared common acts or were part of an otherwise indivisible course of conduct.  (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.)  A defendant's intent and objective is a question of fact for the trial court, which has broad latitude in making its determination.  (*Ibid*.)

Where the trial court makes no express findings under section 654, we presume it impliedly found a separate objective for each offense.  (*In re L.J.* (2021) 72 Cal.App.5th 37, 43.)  We review this finding for substantial evidence.  (*Ibid*.)

3.      *Analysis*

Defendant and the People each cite opinions in which defendants were convicted and sentenced for robbery and kidnapping for robbery after forcing victims to drive to ATMs to withdraw money.

Defendant relies primarily on *People v. Barrios* (2021) 61 Cal.App.5th 176 (*Barrios*).  Barrios, displaying a gun, took the cash from the victim's wallet.  He forced the victim to drive to an ATM and took the funds the victim withdrew.  (*Id*. at p. 178.)  A

15

jury convicted him of robbery and kidnapping for robbery. On appeal, the majority opinion concluded the offenses were not separately punishable, reasoning that robbery could not be broken apart from kidnapping for robbery "absent some event or occurrence that, midstream, marks a transition and redirects the perpetrator to embark on a new criminal objective." (*Id.* at p. 180.) The record did not reflect an epiphany or a change of plans; rather, he "kept doing what he set out to do: commandeer [the victim's] car for a robbery," with the aim of "rob[bing] [the victim] of as much cash as he could." (*Id.* at pp. 180–181.)

The People rely primarily on *People v. Porter* (1987) 194 Cal.App.3d 34 (*Porter*). Porter took the victim's wallet after entering the victim's car and holding a knife to his throat. In the wallet, defendant found less than $10, but he also found an ATM card. He forced the victim to drive to an ATM to withdraw funds, but the victim escaped. (*Id.* at pp. 36–37.) Porter was convicted of robbery and kidnapping for robbery. (*Id.* at p. 37.) The Court of Appeal affirmed concurrent prison terms for each offense, reasoning that "the record suggests that appellant was convicted of the robbery of the victim's wallet and of kidnapping for the purpose of a different robbery involving the compelled withdrawal of funds from an automated teller, which was unsuccessful. This is not, therefore, a case of punishing appellant for kidnapping for the purpose of robbery and for committing 'that very robbery.' [Citation.]" (*Id.* at p. 38.) "What began as an ordinary robbery turned into something new and qualitatively very different. No longer satisfied with simply taking the contents of the victim's wallet, appellant decided to forcibly compel the victim to drive numerous city blocks to a bank where, only with the victim's compelled assistance, could appellant

16

achieve a greater reward. The trial court could reasonably treat this as a new and independent criminal objective, not merely incidental to the original objective and not a continuation of an indivisible course of conduct." (*Id*. at pp. 38–39.)

Here, as in *Porter*, defendant was not separately punished for kidnapping Salinas for the purpose of robbing him of his money and for committing "'that very robbery.'" (*Porter*, *supra*, 194 Cal.App.3d at p. 38.) The robbery count was predicated on the taking of Salinas's phone, while the kidnapping count was predicated on an attempted robbery of money from an ATM. *Barrios* is distinguishable for the same reason.

We disagree with defendant's contention that the crimes shared one objective—stealing Salinas's property. "Such an intent and objective is much too broad and amorphous to determine the applicability of section 654." (*Perez*, *supra*, 23 Cal.3d at p. 552 [rejecting argument that defendant's sole intent and objective was "to obtain sexual gratification," precluding sentences for oral copulation and sodomy when he had been convicted of rape].) It "is akin to an assertion of a desire for wealth as the sole intent and objective in committing a series of separate thefts." (*Ibid*.) "To accept such a broad, overriding intent and objective to preclude punishment for otherwise clearly separate offenses would violate the statute's purpose to insure that a defendant's punishment will be commensurate with his culpability." (*Ibid*.)

Here, by convicting defendant of carjacking, the jury necessarily believed that defendant harbored the objective of taking Salinas's car while in the victim's immediate presence. (CALCRIM No. 1650.) However, the jury's convictions reflect he formed other distinct objectives as well. Defendant robbed

17

Salinas of his phone.  (CALCRIM No. 1600.)  Then, he moved Salinas to the ATM to rob him of money.  (CALCRIM No. 1203.)  In imposing separate punishments, the trial court could reasonably infer that what was planned as a carjacking turned into "new and qualitatively very different" crimes.  (*Porter, supra*, 194 Cal.App.3d at p. 38.)  Accordingly, the trial court did not err in separately punishing each offense.

## C. Invalid Sentence for Kidnapping for Robbery – Count 3

On count 3, kidnapping for robbery, defendant was sentenced to an indeterminate term of "7 years to life" plus 10 years based on defendant's personal use of a handgun (§ 12022.53, subd. (b)), ordered to run consecutively with all other counts.  Defendant argues that this sentence was improper because section 209 does not require a minimum term of seven years or prescribe a penalty of seven years to life.

Defendant's challenge to the sentence presents a question of law that may be raised for the first time on appeal (*People v. Smith* (2001) 24 Cal.4th 849, 852) and is subject to de novo review (*People v. Tua* (2018) 18 Cal.App.5th 1136, 1140).

Defendant is correct that, under section 209, subdivision (b), the punishment for kidnapping for robbery is "imprisonment in the state prison for life with the possibility of parole."  However, he cannot be paroled until he has served "at least seven calendar years" in prison for this conviction.  (§ 3046, subd. (a)(1) ["An inmate imprisoned under a life sentence shall not be paroled until he or she has served the greater of the following:  [¶]  (1) A term of at least seven calendar years."]; see *People v. Jefferson* (1999) 21 Cal.4th 86, 96 (*Jefferson*).)

18

In *Jefferson*, our high court approved the trial court's articulation of the minimum prison term when pronouncing the defendant's indeterminate life sentence. "By including the minimum term of imprisonment in its sentence, a trial court gives guidance to the Board of Prison Terms regarding the appropriate minimum term to apply, and it informs victims attending the sentencing hearing of the minimum period the defendant will have to serve before becoming eligible for parole. Thus, when the trial court here pronounced defendants' sentences, it properly included their minimum terms. . . ." (*Jefferson, supra,* 21 Cal.4th at p. 101, fn. 3.)

Accordingly, the trial court did not err when it articulated this seven-year period as a minimum sentence.

## DISPOSITION

The judgment is affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

MORI, J.

We concur:

COLLINS, Acting P. J.

TAMZARIAN, J.